UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| CHRISTOPHER L. OVERBAY,<br>    Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE<br>Commissioner of Social Security | )<br>)<br>)<br>)   Case No. 2:10-cv-184<br>)   (MATTICE/CARTER)<br>)<br>)<br>)<br>) |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the disposition of the plaintiff's Motion for Judgment on the Pleadings, or, Alternatively, for Remand to Receive and Consider Additional Evidence (Doc. 10) and defendant's Motion for Summary Judgment (Doc. 17).

This action was instituted pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying the plaintiff a period of disability and disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(I) and 423.

For reasons that follow, I RECOMMEND the decision of the Commissioner be AFFIRMED.

### Plaintiff's Age, Education, and Past Work Experience

Plaintiff was born in 1959, and was 50 years of age at the time of the ALJ's decision (Tr. 22, 28, 89). Plaintiff testified at the hearing that he completed the eleventh grade of formal education and that he quit and obtained his GED (Tr. 28, 98). He also completed vocational

1

programs for welding and quality control (Tr. 28, 98). He is presently unemployed and lives alone (Tr. 109-110). His past relevant work experience was in the fields of quality control, and construction/ welding (Tr. 94, 101).

## Claim for Benefits

Plaintiff applied for Social Security Disability Insurance Benefits (DIB) on February 15, 2008, alleging disability since November 8, 2007, due to bipolar disorder (Tr. 83, 93). After his application was denied initially and upon reconsideration, Plaintiff requested an administrative hearing (Tr. 66-64). The administrative law judge (ALJ) held a hearing on May 29, 2009, at which Plaintiff appeared with counsel and testified, along with a vocational expert (Tr. 25-49). In a decision dated September 4, 2009, the ALJ found that Plaintiff was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments (Tr. 16-24). On June 29, 2010, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review (Tr. 1, 12). See 20 C.F.R. §§ 404.955, 404.981. Under 42 U.S.C. §405(g). Plaintiff seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## Standard of Review - Findings of the ALJ

To establish disability under the Social Security Act, a claimant must establish he/she is unable to engage in any substantial gainful activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20

C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity he/she is not disabled; (2) if the claimant does not have a severe impairment he/she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment he/she is disabled; (4) if the claimant is capable of returning to work he/she has done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he/she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520; *Skinner v. Secretary of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990).

Once, however, the claimant makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative

decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

After considering the entire record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since November 8, 2007, the alleged onset date (20 C.F.R. 404.1571 *et seq*.).

3. The claimant has the following severe impairments: seizure disorder, mood disorder, not otherwise specified, bipolar disorder, intermittent explosive disorder, adjustment disorder with mixed emotional features, and cannabis abuse/dependence (20 C.F.R. 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) except that the claimant can only perform simple, repetitive, routine tasks, is better with things than people, and must avoid workplace hazards including unprotected heights, ladders, scaffolding, and driving on the job.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565).

7. The claimant was born on May 1, 1959, and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20

4

C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 8, 2007, through the date of this decision (20 C.F.R. 404.1520(g)).

(Tr. 18-24).

## Issues Raised

I       Whether the ALJ's findings, adopted by the Commissioner, that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526) is correct as a matter of law and supported by substantial evidence.

II      Whether the ALJ's findings, adopted by the Commissioner, that Plaintiff has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) (except that the claimant can only perform simple, repetitive, routine tasks, is better with things than people, and must avoid workplace hazards including unprotected heights, ladders, scaffolding, and driving on the job) is supported by substantial evidence.

III     Whether the ALJ's findings that, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform is supported by substantial evidence.

## Relevant Facts

### Medical Evidence

In August 2007, Plaintiff sought mental health treatment at Cherokee Health Systems; he reported no mental health treatment prior to this visit (Tr. 157). Plaintiff was depressed and had speech and thought processing deficiencies, but his mental status was otherwise normal (Tr.

5

160). He was diagnosed with a mood disorder (not otherwise specified) and cannabis dependence, and assigned a Global Assessment of Functioning (GAF) score of 50 (Tr. 161), which indicated "serious symptoms".[1]

January 2008 treatment notes from Primary Care Center indicated diagnoses of bipolar disorder and depression (Tr. 174-75). These records also included that there was some question about whether or not Plaintiff had suffered a seizure (Tr. 175). He was given Lithium and Prozac and instructed to continue taking Klonipin (Tr. 175).

In March 2008, Dr. Thomas Conway, Plaintiff's treating physician, completed a statement identifying Plaintiff's mental diagnoses as depression and bipolar illness, and indicating that he had referred Plaintiff for mental health treatment and had prescribed Prozac and Lithium (Tr. 163). When asked to elaborate on Plaintiff's condition, Dr. Conway stated that Plaintiff had symptoms of depression, agitation at times, did not leave his home, had difficulty working with others, and had to leave a job in the past due to his temper and agitation (Tr. 164). Dr. Conway opined that Plaintiff's mental conditions impacted his ability to work by causing some impairment with regard to memory and concentration, distorted thinking, flat affect, depressed and anxious mood, slowed psychomotor disturbance, and marginal to poor interaction with others (Tr. 163).

---

[1] The GAF scale reflects a "clinician's judgment" of the individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). The higher the number, the higher the level of functioning. *Id.* A GAF score of 61-70 reflects "some mild symptoms" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well." *Id.* at 34. A GAF score of 51-60 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.* A GAF score of 41-50 reflects "serious symptoms" or "any serious impairment in social, occupational, or school functioning." *Id.*

6

In April 2008, Dr. Roy Nevils, Ph.D., examined Plaintiff and noted Plaintiff's report of a history of explosiveness. Dr. Nevils noted that Plaintiff also seemed to have had adjustment difficulties following the death of his mother and grandmother, which resulted in moderate interpersonal relationship disturbance, in that he could be irritable or withdrawn from others. Based on the mental status examination and Plaintiff's self-report, Dr. Nevils opined that Plaintiff could have mild problems with memory and concentration (Tr. 180). Dr. Nevils diagnosed Plaintiff with intermittent explosive disorder and adjustment disorder with mixed emotional features; he assigned Plaintiff a GAF score of 65 (Tr. 180), which indicated "some mild symptoms." *See DSM-IV-TR* at 34.

In May 2008, Dr. William Meneese, Ph.D., reviewed the medical evidence and opined that Plaintiff needed a well-spaced work setting; could tolerate non-intense interaction with coworkers, supervisors, and the public; and should have only non-confrontational supervision (Tr. 198).

Later in May 2008, Dr. John Fields opined that Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations except that he must avoid concentrated exposure to hazards (machinery, heights, etc.) (Tr. 209-12).

In July 2008, Dr. Robert Blaine examined Plaintiff regarding his seizures and eye problems. Plaintiff reported that he had had seizures "all his life." He said that before he was on medication, he sometimes had one to two seizures per day, but that with the medication, he had about one per week. Plaintiff reported that he did not lose consciousness, but that a couple of times he "almost completely passed out." After having a seizure, Plaintiff said he becomes extremely tired and sleeps for one to two hours. Plaintiff

7

additionally alleged that his eyes had gotten worse over the past several years. On examination, Dr. Blaine found that Plaitniff had a slightly anxious flat affect; his gait and station were normal; and his eye examination (without pupillary dilation) was normal. Dr. Blaine diagnosed Plaintiff with episodes described as seizures and visual problems (Tr. 229).

In August 2008, a medical consultant, Dr. Frank Pennington, reviewed the medical evidence and opined that Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations except that he must avoid all exposure to hazards (machinery, heights, etc.) (Tr. 232-38). Dr. Pennington noted that despite Plaintiff's history of seizure disorder, there was no clear diagnosis of seizures and his impairment was short of listing-level severity. He also noted Plaintiff wore glasses, but his vision did not affect his daily functioning (Tr. 238).

In September 2008, Dr. Andrew Phay, Ph.D., reviewed the medical evidence and opined Plaintiff could remember locations and work-like procedures and understand, remember, and perform simple and detailed tasks; could maintain concentration, perform routine daily activities, and complete a normal work week with acceptable performance and productivity; and could sustain an ordinary work routine around others and make acceptable simple work-related decisions. Dr. Phay opined that Plaintiff would likely have some, but not substantial, difficulty appropriately interacting with the general public, supervisors, and peers in the workplace without significantly disruptive distractions or confrontations. Finally, Dr. Phay opined that Plaintiff appeared to be aware of, and could appropriately respond to, changes and hazards in the workplace, and could set and pursue realistic work goals in the work setting (Tr. 241).

Hearing Testimony

    A.    Plaintiff's Testimony

Plaintiff testified he was unable to control his temper and "could not handle people" (Tr. 30). He had been fired from a past job after he got into an argument with the vice-president of the company (Tr. 31). Plaintiff also did not get along with his neighbors (Tr. 42-43). He said he took medicine and went to counseling, which helped, but the medicine made him sleepy (Tr. 32-33). His daily activities consisted of sleeping and watching television; he did not leave his basement apartment, where he lived by himself (Tr. 41-42). Plaintiff said he had a nurse who came one time per week to check on him, do his laundry, and cook (Tr. 36, 42). He did not drive much (Tr. 35). Plaintiff also testified he had seizures, which lasted for approximately two to five minutes (Tr. 34-35). His seizures caused muscle spasms (Tr. 34). He experienced light sensitivity and did not like music (Tr. 36). Plaintiff could tell when he was going to have a seizure because his face muscles pulled (Tr. 35). The medication he took for his seizures helped his condition (Tr. 34).

    B.    Vocational Expert's Testimony

After hearing Plaintiff's testimony, the ALJ asked the vocational expert to consider a person with Plaintiff's vocational characteristics who could perform simple, routine, repetitive medium work[2] that required him to be better with things than people; did not expose him to hazards such as unprotected heights, ladders, scaffolds; and did not require driving on the job

---

[2] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). A person must also be able to frequently stoop, crouch, and climb ramps and stairs, but limitations on climbing ladders/ropes/scaffolds, kneeling, and crawling would not significantly affect the occupational base. *See* SSR 83-14, 1983 WL 31254 (S.S.A.); SSR 85-15, 1985 WL 56857 (S.S.A.).

9

(Tr. 45). The vocational expert testified that such a person could perform 8,200 jobs in the region and 1.25 million jobs in the nation, including jobs as food preparers, food servers, dish washers, janitors, cleaners, and cashiers (Tr. 45-46). There was also light work consisting of 25,000 jobs in the region and 2.5 million jobs in the nation, including jobs as food preparers, dish washers, janitors, baggers, attendants, sorters, assemblers, hand packagers, and cashiers; and sedentary work consisting of 2,400 jobs in the region and 325,000 jobs in the nation, including jobs as construction laborers, assemblers, sorters, entry level welding and seaming, and food cashiers (Tr. 46). The vocational expert testified that her testimony was consistent with the *Dictionary of Occupational Titles* (Tr. 47).

Analysis

I. Plaintiff first argues he meets or equals Listings 12.04, 12.02, 12.03, 11.01, 11.02, and 11.03 (Doc. 11, Plaintiff's Brief at 11-17). In support of his argument as to Listing 12.04, Plaintiff argues his diagnosis of Depression, Bipolar Disorder, Mood Disorder (NOS), Adjustment Disorder with multiple emotional features, intermittent explosive disorder certainly meet, medically equal (and exceed) the criteria found in the pertinent listing in their own right as well as in combination (Doc. 11, p. 12). Next, Plaintiff contends the record "also suggests that the requirements for a finding of an Organic Mental Disorder," as set out in Listing 12.02, is met. Plaintiff then argues the record indicates Plaintiff "is likely to have other mental disorders as defined by the Social Security Administration due to his documented flat affect, noted withdrawal and social isolation in that he never leaves his basement, and the effects these factors have on his ability to function in his day-to-day life." He then refers to Listing 12.03, Schizophrenic, paranoid and other psychotic disorders. Finally plaintiff argues he meets listings

10

11.01-11.03 because of his description of seizures.

The ALJ found Plaintiff had the following severe impairments: seizure disorder, mood disorder (not otherwise specified), bipolar disorder, intermittent explosive disorder, adjustment disorder with mixed emotional features, and cannabis abuse/dependence, which he concluded did not by themselves or in combination meet or equal a listed impairment. For reasons that follow, I find there is substantial evidence to support this conclusion.

As the Commissioner argues, Plaintiff bears the burden of demonstrating all of the required listing-level findings. *See Sullivan v. Zebley*, 493 U.S. 521, 525 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severe, does not qualify."); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("In order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing. It is insufficient that a claimant comes close to meeting the requirements of a listed impairment.") (citations omitted). Further, all of the criteria must be met concurrently for a period of twelve continuous months. 20 C.F.R. §§ 404.1525(c)(3)-(4), 404.1509; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) ("The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), . . . and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.").

Plaintiff's argument that he met or medically equaled Listings 12.04, 12.02, and 12.03 fails because his argument merely consists of a conclusory listing of his mental health diagnoses, his own self-serving testimony, and "his documented flat affect, noted withdrawal and social

11

isolation in that he never leaves his basement, and the effects these factors have on his ability to function in his day-to-day life."(Doc. 11, Plaintiff's Brief at 12, 14). It is not clear from Plaintiff's argument which part of these Listings he contends he met or equaled. In his decision, the ALJ explained his reasoning of why Plaintiff's mental impairments did not cause "at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration," thus, not satisfying the "paragraph B" criteria of Listings 12.04, 12.02, 12.03 (Tr. 19-20).[3] See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02, 12.03, 12.04. The ALJ also found the evidence failed to establish the presence of the "paragraph C" criteria because the medical evidence "does not demonstrate repeated episodes of decompensation, each of extended duration, such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause decompensation, an inability to function outside a highly supportive living arrangement, or the complete inability to function independently outside the area of h[is] home" (Tr. 20).

Plaintiff also argues he meets Listings 11.01, 11.02 and 11.03. He points to his testimony of a continuing seizure disorder and refers to a document completed by Miriam Petrie, who appears to be a friend of the family. Plaintiff does not describe how he meets the listings but questions the ALJ's development of the record as it relates to his seizures. First, the record reflects the finding of the ALJ that plaintiff's seizure disorder was a severe impairment (Tr. 18). Second, the ALJ considered the statements Petrie made in the function report she filed, which

---

[3] Although the ALJ specifically references Listings 12.04, 12.06, 12.08, and 12.09 in his decision, his analysis equally applies to Listings 12.02 and 12.03 because the "paragraph B" criteria are the same for these Listings. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06, 12.08, 12.09.

12

were essentially the same as those made in her letter to Plaintiff's attorney that Plaintiff cites in his argument (Tr. 19-20, 130-37, 152-53) (Doc. 11, Plaintiff's Brief at 16). Ms. Petrie is referred to as a home health nurse but in her May 23, 2009 letter, she does not identify herself as a nurse but does appear to be a friend of Plaintiff's family who stayed with Plaintiff's grandmother (Tr. 152,153).

Finally, and most significantly, state agency physicians reviewed the medical evidence and found that Plaintiff did not meet or medically equal any Listings. Dr. Meneese found he did not meet listing 12.02, 12.04 or 12.09. In a Psychiatric Review Technique completed on September 29, 2008, Dr. Andrew Phay found Plaintiff did not meet the listings under 12.04, 12.06, 12.08 and 12.09 (Tr. 53-54, 192-93, 253-54). *See* SSR 96-6p ("The signature of a State agency medical or psychological consultant on an SSA 831 U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."). The regulations, at 20 C.F.R. § 404.1525(a), explain that the listings represent a level of severity that are "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience," and the state agency physicians specifically indicated that the objective medical evidence did not preclude work (Tr. 198, 209-12, 232-38, 241). The regulations instruct that state agency reviewing consultants are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f)(2)(i). Pursuant to SSR 96-6p, an ALJ may not find equivalence after those physicians have found no equivalence, unless he has another medical opinion. Although state agency physicians did not address 11.01,

13

11.02 or 11.03, no doctor in this case found that Plaintiff met or equaled any Listing (Tr. 53-54, 192-93, 253-54). Despite a lack of EEG testing for Plaintiff's seizure disorder, Dr. Pennington still found that Plaintiff has history of a seizure disorder but noted there is not clear diagnosis of seizures. The seizure disorder was "short of [Listing level] severity" (Tr. 238). I therefore conclude Plaintiff's argument that the ALJ erred with respect to the Listings is without merit.

    II. In the second issue raised, Plaintiff argues the ALJ's RFC assessment is not supported by substantial evidence. The ALJ found Plaintiff was significantly limited due to his impairments, but was not disabled because he could perform simple, routine, repetitive medium work that required him to be better with things than people; did not expose him to hazards such as unprotected heights, ladders, and scaffolds; and did not require driving on the job (Tr. 20).

    Plaintiff first argues that when assessing residual functional capacity, the Social Security Administration is required to assess the physical abilities, mental abilities, other abilities affected by impairments, and the combined total limiting effects of all impairments. He then argues the ALJ's findings and conclusions were erroneous as a matter of law and unsupported by substantial evidence because they afford improper weight to irrelevant observations. He refers to the ALJ's comment that the Plaintiff's testimony of his seizures is not credible solely on the basis that the Plaintiff "has never been hospitalized for any condition related to his seizures." (Tr. 21)

    He argues the ALJ "appears to have picked and chosen among which evidence would be considered...", and gave "inordinate reliance ....on evidence relating to physical limitations with little regard to mental and other limitations, and a required combination of all limitations", and gave no weight to additional evidence sources such as the Plaintiff's home-health nurse and additional medical providers."

14

On the other hand, the Commissioner argues it was reasonable for the ALJ to conclude that "the course of medical treatment is inconsistent with [Plaintiff's] allegations of disabling seizures," and that "[w]hile [Plaintiff] does take Klonipin, he has never been hospitalized for any condition related to his seizures" (Tr. 21). I agree with the Commissioner that the ALJ's reference to hospital treatment or the lack thereof was not "an abuse of discretion." Plaintiff's lack of hospitalization clearly falls under "Treatment, other than medication," a factor the ALJ could correctly consider in his credibility analysis. 20 C.F.R. § 404.1529(c)(3)(v).

Plaintiff also does not specify what evidence the ALJ did not consider or specifically what "additional medical provider" should have been considered. As to the reliance on Plaintiff's "home health-nurse," I conclude the record is far from clear as to her position as a nurse. Nowhere in her statements does Ms. Petrie claim to be "Plaintiff's home-health nurse," or indicate that she is a licensed nurse (Tr. 130-37, 152-53). She characterizes herself as a friend (Tr. 130); Plaintiff did not mention any nursing duties she performed, but said she cooked for him and did his laundry (Tr. 36, 42). The record shows the ALJ considered the evidence Ms. Petrie submitted and properly treated it as evidence from a lay witness. In any event, Ms. Petrie did not provide any evidence that differed from the evidence considered by the medical sources in the record, whose opinions the ALJ reasonably relied upon.

I conclude there was ample medical evidence to support the conclusion of the ALJ. In March 2008, Dr. Thomas Conway, Plaintiff's treating physician, completed a statement identifying Plaintiff's mental diagnoses as depression and bipolar illness, and indicating that he had referred Plaintiff for mental health treatment and had prescribed Prozac and Lithium (Tr. 163). When asked to elaborate on Plaintiff's condition, Dr. Conway stated that Plaintiff had

15

symptoms of depression, agitation at times, did not leave his home, had difficulty working with others, and had to leave a job in the past due to his temper and agitation (Tr. 164). Dr. Conway opined Plaintiff's mental conditions impacted his ability to work by causing some impairment with regard to memory and concentration, distorted thinking, flat affect, depressed and anxious mood, slowed psychomotor disturbance, and marginal to poor interaction with others (Tr. 163).

In April 2008, Dr. Roy Nevils, Ph.D., examined Plaintiff and referred to Plaintiff's report of a history of explosiveness and noted Plaintiff also seemed to have had adjustment difficulties following the death of his mother and grandmother, which resulted in moderate interpersonal relationship disturbance, in that he could be irritable or withdrawn from others. Based on the mental status examination and Plaintiff's self-report, Dr. Nevils opined Plaintiff could have mild problems with memory and concentration and diagnosed Plaintiff with intermittent explosive disorder and adjustment disorder with mixed emotional features; he assigned Plaintiff a GAF score of 65 (Tr. 180), which indicated "some mild symptoms." *See DSM-IV-TR* at 34.

In May 2008, Dr. William Meneese, Ph.D., reviewed the medical evidence and opined Plaintiff needed a well-spaced work setting; could tolerate non-intense interaction with coworkers, supervisors, and the public; and should have only non-confrontational supervision (Tr. 198).

Later in May 2008, Dr. John Fields opined Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations except that he must avoid concentrated exposure to hazards (machinery, heights, etc.) (Tr. 209-12).

In July 2008, Dr. Robert Blaine examined Plaintiff regarding his seizures and eye problems. Plaintiff reported that he had had seizures "all his life." He said that before he was on

16

medication, he sometimes had one to two seizures per day, but that with the medication, he had about one per week. Plaintiff reported that he did not lose consciousness, but that a couple of times he "almost completely passed out." After having a seizure, Plaintiff said he became extremely tired and slept for one to two hours. Plaintiff additionally alleged that his eyes had gotten worse over the past several years. On examination, Dr. Blaine found that Plaintiff had a slightly anxious flat affect; his gait and station were normal; and his eye examination (without pupillary dilation) was normal. Dr. Blaine diagnosed Plaintiff with episodes described as seizures and visual problems (Tr. 229).

In August 2008, Dr. Frank Pennington reviewed the medical evidence and opined that Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations except that he must avoid all exposure to hazards (machinery, heights, etc.) (Tr. 232-38). Dr. Pennington noted that despite Plaintiff's history of seizure disorder, there was no clear diagnosis of seizures and his impairment was short of listing-level severity. He also noted that Plaintiff wore glasses, but his vision did not affect his daily functioning (Tr. 238).

In September 2008, Dr. Andrew Phay, Ph.D., reviewed the medical evidence and opined that Plaintiff could remember locations and work-like procedures and understand, remember, and perform simple and detailed tasks; could maintain concentration, perform routine daily activities, and complete a normal work week with acceptable performance and productivity; and could sustain an ordinary work routine around others and make acceptable simple work-related decisions (Tr. 241). Dr. Phay opined that Plaintiff would likely have some, but not substantial, difficulty appropriately interacting with the general public, supervisors, and peers in the workplace without significantly disruptive distractions or confrontations (Tr. 241). Finally, Dr.

Phay opined that Plaintiff appeared to be aware of, and could appropriately respond to, changes and hazards in the workplace, and could set and pursue realistic work goals in the work setting (Tr. 241). I conclude the opinions of Dr. Meneese, Blaine, Fields, Pennington and Phay provide substantial evidence to support the ALJ's RFC assessment.

  III. Finally, Plaintiff argues the ALJ's finding that there were jobs which Plaintiff could perform is not supported by substantial evidence. Plaintiff argues the VE knew very little about Plaintiff's work history and medical situation, had no understanding of Plaintiff's diagnosed medical conditions and their effects on his work and no basis for her figures that jobs existed in significant numbers in the national economy. He also argues it is "entirely possible" the data relied on by the VE could have been several decades old (Doc. 11, Plaintiff's Brief at 20,21).

  As the Commissioner notes, Plaintiff's argument demonstrates some confusion concerning the role of the vocational expert. The vocational expert does not determine what restrictions a claimant in fact has. *See* In *Maziarz v. Sec'y of HHS*, 837 F.2d 240, 247 (6th Cir. 1987), where the Sixth Circuit explained that, it is "the ALJ's function to first determine what medical restrictions [a] claimant was under and how they affected his residual functional capacity, and then to determine whether the vocational expert had identified a significant number of jobs in a relevant market given these restrictions." *Id.* Here the ALJ properly posed a hypothetical question to the vocational expert that incorporated all the limitations that he, the ALJ, found supported by substantial evidence (Tr. 45). *See Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."). Therefore, as the Sixth Circuit found in *Smith v. Halter*, 307 F.3d 377,

378 (6th Cir. 2001), the vocational expert's testimony concerning the availability of jobs constituted substantial evidence.

Plaintiff also questioned the vocational expert's basis for her job figures (Doc. 11, Plaintiff's Brief at 21). However, Plaintiff again does not present any specific deficiencies, noting only that general deficiencies may have been "possible." *Id.* The vocational expert's testimony was consistent with the *Dictionary of Occupational Titles* (Tr. 47). The ALJ was not required to conduct his own investigation into her testimony to determine its accuracy. *See Martin*, 170 F. App'x at 374; *Ledford*, 2008 WL 5351015, at *10. Furthermore, the vocational expert did not "speculate" as to job availability in an "undefined" region, as Plaintiff suggests (Doc. 11, Plaintiff's Brief at 21). Rather, the region was defined as the State of Tennessee, and nothing in the vocational expert's testimony suggested that she was speculating on her job numbers (Tr. 45-46). She testified that 8,200 medium jobs were available regionally and 1.25 million nationally (Tr. 45-46), which the ALJ reasonably found was a significant number of jobs (Tr. 23). *See Hall v. Bowen*, 837 F.2d 272, 273, 275-76 (6th Cir. 1988) (1,350 jobs is a significant number of jobs in Dayton area and national economy); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009) (affirming based on 270,000 jobs in the national economy). Further, as to the argument the data could have been decades old, Plaintiff was represented by counsel at the administrative hearing and did not challenge the validity of the data upon which the VE relied. On the basis of the uncontradicted testimony of the VE, I conclude substantial evidence supported the ALJ's finding that Plaintiff could perform a significant number of jobs in the national economy.

19

Conclusion

For the reasons stated herein, I conclude there is substantial evidence to support the conclusion of the ALJ and I therefore RECOMMEND the Commissioner's decision be AFFIRMED.

I further RECOMMEND defendant's Motion for Summary Judgment (Doc. 17) be GRANTED, and plaintiff's Motion for Judgment on the Pleadings, or, Alternatively, for Remand to Receive and Consider Additional Evidence (Doc. 10) be DENIED.[4]

                                                               s/William B. Mitchell Carter
                                                               UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).